David Wawro (DW-3282)
Ian M. Goldrich (IG-5653)
TORYS LLP
237 Park Avenue
New York, New York 10017
Tel: (212) 880-6000
Fax: (212) 682-0200
Attorneys for Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
D.B. ZWIRN SPECIAL OPPORTUNITIES
FUND, L.P.,
                              Plaintiff,

          - against -

TAMA BROADCASTING, INC.
                              Defendants.

------------------------------------------------------------- x

Civil Action No. 08 Civ. 3125(SAS)

**AFFIDAVIT OF DR. GLENN W. CHERRY IN OPPOSITION TO PLAINTIFF'S MOTION FOR APPOINTMENT OF A TEMPORARY RECEIVER**

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF HILLSBOROUGH     )

Dr. Glenn W. Cherry, being duly sworn, hereby deposes and say:

1.      I am President, Chief Executive Officer and a member of the board of directors of Tama Broadcasting, Inc. and of the other various Tama-affiliated entities that hold the Federal Communications Commission (FCC) authorizations to broadcast on nine radio stations in areas in and around Tampa, FL, Jacksonville, FL, and Savannah, GA. I am familiar with the facts herein, and submit this affidavit in opposition to the request of Plaintiff D.B. Zwirn Special Opportunities Fund, L.P. (DBZ) for an Order to Show Cause for Appointment of a Temporary Receiver.

2.     I am an experienced radio station owner. I have had a controlling interest in at least one radio station since 1989. In 1997, I became a full-time radio owner-operator. Thus, I have several years of personal experience in radio station operations and management.

3.     In the Affidavit of Peter Leibman, DBZ claims that Tama owes it more than $39 million. We dispute that figure, which has never been verified by DBZ. DBZ funded Tama on or about March 18, 2004 with less than $16 million, exclusive of 18 months of prepaid interest that was a condition of the First Term Loan. As a consequence, I do not believe that Tama is 'insolvent;' I believe that the value of the Collateral is higher than the total amount owed to DBZ.

4.     Some six months into the First Term Loan, DBZ declared Tama in default after the state of Florida was hit with four hurricanes during the disastrous 2004 hurricane season, which knocked multiple Tama stations off the air and detrimentally affected Tama's revenue.

5.     On June 30, 2005, Tama executed the Amended Financing Agreement for the Second Term Loan of $1.5 million primarily to pay anniversary fees, interest and alleged default penalties. Tama was funded approximately $600,000 net of fees and interest.

6.     Contrary to the Leibman Affidavit, the Forbearance Agreement dated as of January 23, 2007 expired under its own terms on February 15, 2007 and did not automatically renew under identical terms and conditions.

7.     Since 2006, DBZ and Tama's equity partner, Black Enterprise/Greenwich Street Fund, L.P., ("BE/GS") have been engaged in an effort to restructure the Amended Financing Agreement and to wind up the Tama entities' affairs.

8.      Pursuant to relevant investment agreements executed by all Tama shareholders, BE/GS gained controlling interest of Tama as of August, 2007. As a part of this internal restructuring, at DBZ's insistence, Tama executed a Local Marketing Agreement ("LMA") dated as of September 10, 2007.  A true and correct copy of the  LMA is annexed hereto as Exhibit 1 and is incorporated herein by reference.

9.      At the time I executed the LMA, I was informed by BE/GS that DBZ would ensure that the financial position of the company did not get worse, and that DBZ would advance additional money if necessary to cover any shortfalls while restructuring talks continued.  In the spirit of cooperation with BE/GS and under the threat of foreclosure from DBZ, I agreed to sign the LMA.

10.     Almost immediately, DBZ's affiliates, Bernard Radio/Straight Way Radio and DBZ's consultant, Chris McMurray, took complete control of Tama's nine radio stations in ways that may violate FCC rules and regulations.  It is DBZ and McMurray who "grossly mismanaged" Tama's properties, thus putting its FCC licenses, its ability to continue to broadcast at risk, as detailed below.

11.     McMurray claims to have over 33 years experience in the radio business and says she is very familiar with FCC rules and regulations in her affidavit.  If that is indeed the case, I can only conclude that DBZ's clear and continuing violation of basic requirements is willful and wanton.

12.     I have on several occasions  requested that DBZ notify me of any changes that they are planning to the programming of the stations. McMurray has refused to do so and has refused to deal with me directly in the operation of this LMA.   Her interaction with me is primarily through former employees of Tama's business department who now work for DBZ.

13.    Under FCC regulations, the control of an FCC radio license is based on who controls the programming, personnel and financial condition of the licenseholder. If a licenseholder loses control of any of these three factors, it places itself at risk of violating federal law, including revocation of its licenses.

14.    As an example of DBZ's illegal efforts to control Tama's programming, DBZ has cancelled Tama contracts for programming in Tampa, FL and Jacksonville, FL without my consent or knowledge, and changed programming formats without my knowledge. Thus, DBZ, through McMurray, has done irreparable damage to well-established long-term business relationships with providers of nationally syndicated programming by not allowing Tama to properly cancel contracts, or negotiate an exchange of airing commercials without airing the programming, thus placing Tama in default of programming agreements.

15.    As an example of DBZ's illegal efforts to control Tama's finances, DBZ changed the deposit account for direct payments due from Google to Tama for the sale of radio commercials, and diverted payments to DBZ's bank account without my permission or knowledge.

16.    As an example of DBZ's illegal efforts to control Tama's finances and personnel, the work hours for the contract engineer for Tama stations in Jacksonville, FL were reduced without my knowledge or consent, although that meant that continuous technical compliance with FCC rules and regulations were compromised.

17.    Among the continuing violations is DBZ's refusal to reimburse Tama for payment of operating expenses, including tower rents and studio rent as required by the LMA. Contrary to McMurray's affidavit, it is DBZ's refusal to make the required payments to Tama that has caused Tama to be in default of liabilities that were being paid on a timely basis, or were

being paid pursuant to payment arrangements negotiated by all other creditors (other than DBZ) and Tama prior to the execution of the LMA.

18.     DBZ has also refused to pay tower and studio rent in the Tampa, FL and the Savannah, Georgia markets to the landlord, Group Assets LLC, in which I have an ownership interest. Tama cannot remain on the air if it is evicted from these tower sites. These lease payments are imperative to the day-to-day operations if Tama is to derive revenue pursuant to the LMA. DBZ is responsible under the LMA for these payments, which were current up to the start of the LMA.

19.     McMurray also states that Arbitron, a radio ratings service, is critical to the ability to maintain sales revenue. She has used Tama's authorization to use Arbitron's intellectual property, and has refused to pay for it. Thus, DBZ is responsible for $120,000 of the total cost to Arbitron through the period of the LMA, based on the monthly cost of the Arbitron service.

20.     With regard to Tama's broadcasting equipment, contract engineers in all three Tama markets will attest that Tama has purchased four new transmitters (of the nine required for Tama's nine stations) over the past five years. Two of stations have transmitters that are less than ten years old. The oldest transmitter in the Tama organization is an upgraded 1992 model, which is still well within radio industry standards.

21.     Tama's contract engineers keep maintenance logs on service of all transmitting facilities and report that all equipment is operational and serviceable. All nine Tama transmitters are currently on the air, running at full power and in compliance with FCC technical guidelines. To date, McMurray has not reported any technical anomalies to me.

22.    In its eight-year history, Tama has not been cited by the FCC for violation of any FCC rule or regulation. In fact, DBZ cancelled a contract without my knowledge or consent that allows Tama to legally maintain main studio coverage in Folkston, GA, per FCC regulations. If the FCC cited Tama for a violation as a consequence of DBZ's illegal cancellation of this lease agreement, it would likely result in a fine, not a revocation of the license, due to our history of no previous violations in eight years.

23.    Contrary to McMurray's Affidavit, the construction permits issued by the FCC have not expired. They allow three years for Tama to study the cost-benefit of relocating signals to improve coverage. In this time of declining value of broadcasting properties, Tama is still assessing whether the value added to the stations outweighs the cost of the construction. We are experienced broadcasters; we have renewed construction permits before with the FCC, and we finished a construction permit upgrade in Savannah in 2006 in less than six months.

24.    Tama currently owns only one tower that was recommended to be painted in January by our engineer. It is scheduled to be painted later this year. The other two towers that require painting are leased and we are negotiating with the owners of towers to get that done.

25.    The personal property taxes are overdue on equipment Tama owns in Jacksonville only. A payment plan can be worked out with Duval County, Florida, and I believe nonpayment is no threat to the company.

26.    In late January 2008, respective legal counsel drafted and circulated a written proposed restructuring agreement.

27.    On or about January 29, 2008, DBZ, through its legal counsel, delivered a Notification of Public Disposition (the "Notification") of the same Collateral that is the subject

matter of this request for receivership. The Collateral was to be sold at 'public' auction at the offices of DBZ's New York legal counsel. This fact is omitted from DBZ's motion papers.

28.    During the midst of the restructuring negotiation, I requested that the Notification and its amendment be rescinded. DBZ and their counsel informed us that they would consider rescinding the Notification and its amendment if further progress could be made in the restructuring negotiation.

29.    Tama objected to the time, place, and manner of the sale and subsequently filed a Complaint for Injunctive Relief and a motion for temporary injunction to prevent the sale. The motion was denied by a Florida state trial court. However, Florida's First District Court of Appeal stayed the sale pending an interlocutory appeal. DBZ subsequently removed the state court proceeding to the U.S. District Court for the Northern District of Florida, where it remains pending. I now believe that the goal of the LMA was for DBZ to drive Tama into insolvency as a way to justify a receivership, with the ultimate goal of applying to the FCC for the broadcast licenses.

30.    The Collateral is not in imminent danger of being lost or materially injured. The best way to maintain the Collateral is to cancel the LMA between Zwirn and Tama and return sole management to Tama, which we have proceeded to do by sending DBZ a notice of default.

31.    I have fielded inquires from other well-qualified radio groups who are willing to enter into LMAs with Tama's stations, which I believe would allow Tama to improve its financial condition pending restructuring or sale.

32.    The financial and operational damage done to Tama is directly due to the improper actions of DBZ outlined above. Under the circumstances, to allow a temporary

receiver to be appointed by this court as selected by DBZ would allow DBZ to benefit from its

own wrongful conduct.

DR. GLENN W. CHERRY

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

Dr. Glenn W. Cherry, who is personally known to me or has provided a Florida driver's license
as identification, acknowledged this Affidavit before me this 28th day of March 2008.

NOTARY PUBLIC, State of Florida at Large

My Commission expires: 10/26/2010

SANDRA L. KOS
Notary Public State of Florida
My Comm  Expires June 26, 2010
No DD 568527

Exhibit 1

## LOCAL MARKETING AGREEMENT

This Local Marketing Agreement ("Agreement") is made and entered into as of September 10, 2007 (the "Commencement Date"), by and among Tama Broadcasting, Inc., a Delaware corporation; Tampa Broadcasting, LTD., a Florida limited partnership; Tama Group, L.C., a Florida limited liability company; Tama Broadcasting Group of Florida, L.C., a Florida limited liability company; Tama Radio Licenses of Tampa, Florida, Inc., a Florida corporation; Tama Radio Licenses of Tampa, Florida, Inc., a Florida corporation; Tama Radio Licenses of Savannah, Georgia, Inc., a Florida corporation, and Tama Radio Licenses of Jacksonville, Florida, Inc., a Florida corporation (collectively, the "Licensees"), each with a business address of 5027 Washington Boulevard, Tampa, Florida, 33619, and Bernard Radio LLC, a Delaware limited liability company (the "Broker"), with a business address of 745 Fifth Avenue, 18th Floor, New York, New York, 10151.

### RECITALS

A.      The Licensees operate the following radio broadcast stations (collectively, the "Stations") which are licensed by the Federal Communications Commission ("FCC"): (i) WTMP(AM), Egypt Lake, Florida (FCC Facility ID No. 74108), (ii) WTMP-FM, Dade City, Florida (FCC Facility ID No. 15239), (iii) WHJX(FM), Baldwin, Florida (FCC Facility ID No. 52032), (iv) WJSJ(FM), Fernandina Beach, Florida (FCC Facility ID No. 40483), (v) WSJF(FM), St. Augustine Beach, Florida (FCC Facility ID No. 53672), (vi) WFJO(FM), Folkston, Georgia (FCC Facility ID No. 22005), (vii) WSSJ(FM), Rincon, Georgia (FCC Facility ID No. 54805), (viii) WSGA(FM), Hinesville, Georgia (FCC Facility ID No. 64428), and (ix) WTHG(FM), Hinesville, Georgia (FCC Facility ID No. 7816).

B.      The Licensees have broadcast time available for sale on the Stations and desire that Broker provide radio programming to fill such time that is responsive to the needs, interests, issues, and desires of the Stations' communities of license and service areas.

C.      The Broker desires to purchase time on the Stations to present its programming on the Stations and to sell advertising time for inclusion in said programming, and is willing to purchase that broadcast time, subject to the limitations set forth herein.

NOW, THEREFORE, for and in consideration of the mutual covenants herein contained, the sufficiency of which are acknowledged, the parties hereto have agreed and do agree as follows:

1.      **Term.** Commencing on the Commencement Date, Licensees agree to make their broadcasting transmission facilities available to Broker and to broadcast on the Stations, or cause to be broadcast, Broker's radio programs. The term of this Agreement (the "Term") shall terminate as provided in Section 9.1 herein.

2.      **Consideration.** As consideration for the airtime made available hereunder, Broker shall make payments to Licensees as set forth in **Attachment I**.

3.    <u>Stations Facilities.</u>

    3.1.    **Program Time.**  Throughout the Term, Licensees shall make available to Broker the broadcast transmission facilities of the Stations, and shall cause to be broadcast using such facilities the programming provided to Licensees by Broker.  Licensees' broadcast transmission facilities shall be made available to Broker by Licensees for the maximum time authorized up to one hundred sixty-eight (168) hours per week, Sunday through Saturday, except for downtime occasioned by routine maintenance.  Broker shall make available to Licensees its programming during a sufficient number of hours to enable the Stations to meet the minimum hours of operation required under the rules and regulations of the FCC and the policies adopted pursuant to such rules and regulations (the "FCC Rules").

    3.2.    **Use of Facilities.**  To facilitate delivery of programming by Broker to Licensees hereunder, Licensees hereby grant to Broker the non-exclusive right for the term of this Agreement to use the equipment owned or leased by Licensees in the studios of the Stations (collectively, the "Studios") for broadcasting programs on the Stations pursuant to this Agreement (the "Broadcast Equipment").  In addition, Broker shall have, and Licensees hereby grant to Broker, a nonexclusive license to enter the premises on which the Studios are located for purposes of producing their programming hereunder.  In the event that it exercises this right to use the Studios, Broker shall maintain the Broadcast Equipment free and clear of liens, claims or encumbrances of any third party claiming by, through or under Broker.  Alternatively, Broker may originate its programs for broadcast on the Stations from Broker's own studios or other locations, in which case Broker shall be responsible, at its sole expense, for the delivery of such programming to the Stations.

    3.3.    **Maintenance; Interruption of Normal Operations.**  Licensees shall use their best efforts to provide at least forty-eight (48) hours' notice to Broker in advance of any maintenance work affecting the operation of the Stations, which shall be undertaken at such hours and on such terms as to cause the least disruption to Broker's operations.  If any of the Stations suffers any loss or damage of any nature to its transmission facilities which results in the interruption of service or the inability of such Station to operate with its maximum authorized facilities, Licensees shall notify Broker as soon as possible and shall, as soon as possible, undertake such repairs as are necessary to restore full-time operation of such Station with its maximum authorized facilities, after the occurrence of any such loss or damage.  If Licensees are unable to complete such repairs within a reasonable time, Broker may cooperate with Licensees by undertaking such repairs, subject to Licensees' supervision.

    3.4.    **Force Majeure.**  Any failure or impairment of facilities or any delay or interruption in the broadcast of programs, or failure at any time to furnish facilities, in whole or in part, for broadcast, due to a cause beyond the control of Licensees, shall not constitute a breach of this Agreement.  Broker and Licensees shall exercise commercially reasonable efforts to remedy any such conditions affecting compliance with their obligations under this Agreement.

    3.5.    **Use of Broker Assets.**  To the extent any of the assets used in the operation of the Stations are owned by Broker, Broker agrees to permit Licensees to use such assets as necessary to fulfill their obligations as FCC Licensees of the Stations, in accordance with the terms of this Agreement.

4.    **Stations Programming Policies.**

4.1.    **Station Programming.**    Broker agrees and covenants that all programming, advertising spots, promotional material, and announcements that it provides for broadcast on the Stations shall comply in all material respects with all applicable federal, state and local laws, rules and regulations, including the Communications Act of 1934, as amended (the "Act"), the FCC Rules, and the rules and regulations of the Federal Trade Commission ("FTC") (collectively, "Broadcast Regulations"). Broker acknowledges that Licensees have not urged, counseled, or advised the use of any unfair business practice. If Licensees determine in good faith that a program or announcement presented for broadcast by Broker does not comply with the Broadcast Regulations, it may, upon prior written notice to Broker (to the extent time permits such notice), suspend or cancel such program or announcement without liability to Broker. Licensees will use reasonable efforts to provide such written notice to Broker prior to the suspension or cancellation of such program. Licensees shall have no liability to Broker for suspending or canceling programming pursuant to this Section 4.1.

4.2.    **Broker Compliance with Copyright Act.**    Broker represents and warrants to Licensees that Broker has full authority to broadcast its programming on the Stations, and that Broker shall not broadcast any material in violation of the Copyright Act. All music supplied by Broker shall be: (i) licensed by ASCAP, SESAC or BMI; (ii) in the public domain; or (iii) cleared at the source by Broker. The right to use the programming and to authorize its use in any manner shall be and remain vested in Broker.

4.3.    **Sales.**    Broker shall retain all revenues from the sale of advertising time associated with the programming it provides to Licensees during the Term. Broker shall be responsible for payment of the commissions due to any national sales representative engaged by it for the purpose of selling national advertising that is carried during the programming it provides to Licensees.

4.4.    **Payola.**    Broker agrees that it will not accept any consideration, compensation, gift or gratuity of any kind whatsoever, regardless of its value or form, including, but not limited to, a commission, discount, bonus, material, supplies or other merchandise, services or labor (collectively "Consideration") for the inclusion of any matter as part of the programming or announcements supplied by Broker to Licensees for broadcast on the Stations, whether or not pursuant to written contracts or agreements between Broker and merchants or advertisers, unless the party making or accepting such Consideration is identified in the program or announcement for which Consideration was provided as having paid for or furnished such Consideration, in accordance with the Act and FCC requirements. Broker agrees that every two (2) months, or more frequently at the reasonable request of Licensees, it will execute and provide Licensees with a Payola Affidavit from each of its employees involved with the Stations substantially in the form attached hereto as **Attachment II.**

4.5.    **Cooperation on Programming.**    Broker, in cooperation with Licensees, will endeavor to ensure that programming is broadcast which is responsive to the needs and interests of the Stations' communities-of-license and service areas. Broker shall, upon reasonable request, provide Licensees with information concerning such of Broker's programs as are responsive to community issues so as to assist Licensees in the satisfaction of their public service programming obligations. Broker shall also provide Licensees such other information

LOCAL MARKETING AGREEMENT                                          Page 3 of 11

necessary to enable Licensees to prepare records and reports required by the FCC or other local, state or federal government entities, including the quarterly issues/programs lists required by the FCC. Broker shall promptly provide Licensees with any complaints or comments received regarding any material broadcast on the Stations.

      4.6.   **Stations Identification and EAS.** Broker shall cooperate with Licensees to ensure compliance with the applicable FCC Rules regarding the broadcast of hourly station identification announcements and required Emergency Alert System ("EAS") tests.

      4.7.   **Political Advertising.** Any qualified political candidate for federal office shall have access to the Stations under this Agreement in accordance with the Act and the applicable FCC Rules. In addition, Broker shall cooperate with Licensees to assist Licensees in complying with all other FCC Rules regarding political broadcasting. Licensees shall promptly supply to Broker upon request, and Broker shall promptly supply to Licensees upon request, such information, including all inquiries concerning the broadcast of political advertising, as may be necessary to comply with the FCC Rules, including the lowest unit rate, equal opportunities, reasonable access, political file and related requirements of the Act and the federal election laws. Licensees, in consultation with Broker, shall develop a statement that discloses their political broadcasting policies to political candidates, and Broker shall follow those policies and rates in the sale of political programming and advertising to be broadcast on the Stations. In the event that Broker fails to satisfy the political broadcasting requirements under the Act, the FCC Rules and any other applicable federal election laws and such failure inhibits Licensees in their compliance with the FCC Rules regarding political broadcasting, then to the extent reasonably necessary to assure such compliance, Broker shall either provide rebates to political advertisers or release broadcast time and/or advertising availabilities to Licensees at no cost to Licensees.

      4.8.   **Licensees Control of Programming.** Licensees shall maintain such rights to suspend or preempt programming as provided in Sections 4.1 and 6.1 herein.

      4.9.   **Intellectual Property.** Licensees hereby grant to Broker a license to utilize the call signs, slogans, and other intellectual property of the Stations, to the extent owned by Licensees, during the term of this Agreement.

    5.   **Responsibility for Employees and Expenses.**

      5.1.   **Employees.** Licensees shall employ such personnel as shall be necessary to comply with FCC Rules regarding the staffing of main studios for the Stations, and will be responsible for the salaries, taxes, benefits, insurance and related costs for all such employees. Licensees shall be solely responsible for the costs of terminating any of their existing employees in connection with the implementation of this Agreement, including any insurance or other benefits due or accrued vacation time.

      Broker shall employ and be responsible for the salaries, commissions, taxes, insurance and all other related costs of all personnel and property involved in the production and broadcast of Broker's programming, including air personalities, salespersons, traffic personnel, board operators, technical staff and other programming staff members. Whenever on the Stations' premises, Broker's personnel shall be subject to the supervision and the direction of Licensees.

5.2.    **Expenses and Liabilities.**

A.    Licensees shall be responsible for payment of the costs set forth in **Attachment I** hereto associated with the day-to-day operation of the Stations, subject to reimbursement by Broker as set forth in **Attachment I** hereto.

B.    Broker shall be responsible for all liabilities, debts and obligations of Broker based upon the purchase of air time on the Stations under this Agreement and use of Licensees' transmission facilities including, without limitation, accounts payable, barter agreements and unaired advertisements. Broker shall pay for all telephone calls associated with program production and listener responses, and for any other copyright fees attributable to its programming broadcast on the Stations pursuant to this Agreement. Broker shall make any arrangements necessary and be solely responsible for the cost of delivering Broker's programming to the Stations from any location other than the Studios.

6.    **Operation of Stations.** Notwithstanding any other provision of this Agreement, Licensees shall have full authority and power over the operation of the Stations during the Term of this Agreement.

6.1.    **Licensees Control of Stations' Operations.** Licensees shall retain control over the policies, programming and operations of the Stations, including, without limitation: (i) the right to suspend or cancel programming or advertisements pursuant to Section 4.1 herein, (ii) the right to preempt any programs not in the public interest or in order to broadcast a program deemed by Licensees to be of greater national, regional or local interest (provided that Licensees shall exercise such right only to the extent necessary to carry out their obligations as FCC Licensees, and shall not exercise such right in an arbitrary manner or for the commercial advantage of Licensees or others), and (iii) the right to take any other actions necessary for compliance with federal, state and local laws, the Act, the FCC Rules, and the rules, regulations and policies of other federal government entities, including the FTC and the United States Department of Justice. Licensees will use their best efforts to give Broker reasonable notice in writing of their intention to preempt Broker's programs. Licensees also shall retain the right to break into Broker's programming without prior notice in case of an emergency.

6.2.    **Licensees Responsibility for FCC Compliance.** Licensees shall at all times be solely responsible for meeting all of the applicable FCC Rules with respect to public service programming, for maintaining the political and public inspection files and the Stations' logs, for the preparation of issues/programs lists, and for retaining and supervising a chief operator, as that term is defined by the FCC, to ensure compliance with the FCC Rules governing the technical operation of the Stations. Broker shall maintain all necessary records to permit Licensees to meet their obligations under this paragraph. Licensees shall continue to maintain and staff main studios, as that term is defined by the FCC, in compliance with the FCC Rules regarding maintenance and operation of the main studio of a radio broadcast station. Except as required to comply with FCC Rules and policies, including those regarding the maintenance of the public inspection file (which shall at all times remain the responsibility of Licensees), Licensees shall not be required to receive or handle mail, cables, or telegraph messages in connection with programs broadcast on the Stations.

6.3.    **Depiction of Licensees.**  Broker agrees that, during the Term of this Agreement, it shall not represent itself to be the FCC licensee of the Stations to any party.

6.4.    **Contracts.**  A list of all existing programming, cash, advertising and trade/barter agreements, is set forth in **Attachment III** hereto ("Licensees' Contracts"). Without in any way assuming any obligation related thereto, the Broker may, at its election and in its discretion, perform obligations of the Licensees under the Licensees' Contracts, and when Broker has performed such obligations, Broker shall retain all revenues earned and collected from such performance. Neither Broker nor Licensees will enter into any third-party contracts, leases or agreements that would conflict with this Agreement or result in a material breach of this Agreement.

7.    **[Reserved]**

8.    **Default.**

8.1.    **Events of Default.**  The following shall, after the expiration of the applicable cure periods, constitute Events of Default:

A.    Broker's failure to timely pay the LMA Fee (as that term is defined in **Attachment I** hereto) or any obligations required to be met by the Broker hereunder;

B.    the default by either party hereto in the material observance or performance of any material covenant, condition or agreement contained herein;

C.    if Broker (i) shall make a general assignment for the benefit of creditors, or (ii) files or has filed against it a petition for bankruptcy, reorganization or an arrangement for the benefit of creditors, or for the appointment of a receiver, trustee or creditor representative for the property or assets of such party under any federal or state insolvency law, which, if filed against such party, has not been dismissed or discharged within sixty (60) days; or

D.    if any material representation or warranty herein made by either party hereto, or in any certificate or document furnished by either party to the other pursuant to the provisions hereof, shall prove to have been false or misleading in any material respect as of the time made or furnished.

8.2.    **Cure Periods.**  An Event of Default shall not be deemed to have occurred until ten (10) business days after the non-defaulting party has provided the defaulting party with written notice specifying the event or events that if not cured would constitute an Event of Default and specifying the action necessary to cure the default within such period, except that an Event of Default under Paragraph 8.1(A) shall be deemed to have occurred automatically ten (10) calendar days after the day that the consideration provided for herein is due to be paid to Licensees, but has not been paid, unless Licensees provide an extension of time for such payment. This period may be extended for a reasonable period of time by an agreement between the parties, for so long as the defaulting party continues to act in good faith to cure the default and such default is not materially adverse to the other party.

9.    **Termination.**

9.1.    This Agreement shall terminate (i) upon the fifth anniversary of the Commencement Date or (ii) otherwise pursuant to the terms of this Agreement.

9.2.    **Termination Upon Default.** Upon the occurrence of an Event of Default, the non-defaulting party may terminate this Agreement provided that it is not also in material default hereunder. Notwithstanding the foregoing, nor any provision of this Agreement, any termination of this Agreement: (i) shall not constitute an election of remedies with regard to such default or such termination; and (ii) shall not affect or limit the ability of the non-defaulting party to avail itself of any and all remedies which otherwise would have been available to it, at law or in equity.

9.3.    **Termination Upon Order of Governmental Authority.** Subject to the termination rights provided herein, if this Agreement is challenged at the FCC, counsel for Licensees and counsel for Broker shall jointly defend the Agreement and the parties' performance thereunder throughout all FCC proceedings. If portions of this Agreement do not receive the approval of the FCC staff, then the parties shall reform the Agreement as necessary to satisfy the FCC staff's concerns. If the parties are unable to reform the Agreement as necessary to satisfy such concerns, either party may terminate this Agreement by giving thirty (30) days' prior written notice to the other party. Subject to the termination rights provided herein, in the event that the FCC or another government authority designates a hearing with respect to the continuation, renewal or revocation of any authorization held by Licensees for the operation of the Stations or initiates any revocation or other proceeding with respect to the authorizations issued to Licensees for the operation of the Stations, and Licensees elect to contest the action, then Broker shall cooperate and comply with any reasonable request of Licensees to assemble and provide to the FCC information relating to Broker's performance under this Agreement.

9.4    **Cooperation Upon Termination.** If this Agreement is terminated for whatever reason, the parties agree to reasonably cooperate with one another to restore the *status quo ante*. Without limiting the foregoing:

A.    Broker shall return to Licensees any equipment or property owned by Licensees and used by Broker, its employees or agents, in substantially the same condition as such equipment was on the Commencement Date of this Agreement, ordinary wear and tear excepted. Any equipment purchased by Broker in replacement of any obsolete or unusable equipment of Licensees shall be the property of Broker, and any other equipment purchased by Broker shall remain the property of Broker.

B.    Licensees shall return to Broker any equipment or property owned by Broker and used by Licensees, its employees or agents, in substantially the same condition as such equipment was on the Commencement Date of this Agreement, ordinary wear and tear excepted. Any equipment purchased by Licensees in replacement of any obsolete or unusable equipment of Broker shall become the property of Broker, and any other equipment purchased by Broker shall remain the property of Broker.

C.    Broker shall cooperate with Licensees to allow Licensees to assume, in Licensees' sole discretion, Broker's advertising or other programming contracts then

outstanding, in which event Licensees shall receive as compensation for the carriage of such programming that which otherwise would have been paid to Broker hereunder.

10.   **Mutual Representations, Warranties and Covenants.** Both Licensees and Broker represent that they are legally qualified, empowered and able to enter into this Agreement, and that the execution, delivery and performance hereof shall not constitute a breach or violation of any agreement, contract or other obligation to which either party is subject or by which it is bound. Without limiting the foregoing:

A.   Broker certifies that this Agreement complies with the FCC Rules regarding multiple ownership of radio broadcasting stations, 47 C.F.R. §73.3555; and

B.   Licensees certify that they maintain ultimate control of the Stations' facilities, including control over Stations finances, personnel and programming.

11.   **Notices.** All necessary notices and requests permitted or required under this Agreement shall be in writing and shall be sent (i) by facsimile transmission to the facsimile numbers listed herein, (ii) mailed by certified mail, return receipt requested, postage prepaid, to the addresses listed herein, or (iii) sent for overnight delivery via a nationally-recognized overnight delivery service to the addresses listed herein. Such notices and requests shall be deemed to have been given (i) if sent by facsimile, upon sender's receipt of a facsimile confirmation sheet, (ii) if mailed, three (3) days after being sent, or (iii) if sent for overnight delivery, one (1) day after being sent.

| | |
|---|---|
| If to Licensees: | Tama Broadcasting, Inc.<br>c/o Black Enterprises/Greenwich Street<br>    Corporate Growth Partners, L.P.<br>Attn: Jeffrey Scott<br>641 Lexington Avenue<br>New York, New York 10022<br>(Fax) (212) 796-8788 |
| with a copy to: | Tama Broadcasting, Inc.<br>5027 Washington Boulevard<br>Tampa, Florida 33619<br>(Fax) (813) 628-0713 |
| If to Broker: | Bernard Radio LLC<br>Attn: Peter Leibman and Chris McMurray<br>745 Fifth Avenue, 18th Floor<br>New York, New York 10151<br>(Fax) (646) 720-9177 |

12.   **Modification and Waiver.** No modification of any provision of this Agreement shall in any event be effective unless it is in writing and signed by all parties, and then such modification shall be effective only in the specific instance and for the purpose for which given.

13.    **Construction.**  This Agreement shall be construed in accordance with the Act, the laws of the State of New York and the FCC Rules.  This Agreement shall not be interpreted or construed more strictly against any one party by reason of any rule of interpretation or construction under which a document is to be construed more strictly against the drafting party.

14.    **Assignment.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Broker may assign this Agreement to an affiliate without the prior consent of Licensees.  Except as provided in the preceding sentence, this Agreement shall not be assigned without the prior written consent of the other party hereto.

15.    **Counterpart Signatures.**  This Agreement may be signed in one or more counterparts, each of which shall be deemed a duplicate original, binding on the parties hereto notwithstanding that the parties are not signatory to the original or the same counterpart.  This Agreement shall be effective as of the date first above written.

16.    **Entire Agreement.**  This Agreement constitutes the entire agreement among the parties, and there are no other agreements, representations, warranties or understanding, oral or written, among them with respect to the subject matter hereof.  No alteration, modification or change of this Agreement shall be valid unless it is in writing executed by all parties hereto.

17.    **No Partnership or Joint Venture Created.**  Nothing in this Agreement shall be construed to make Licensees and Broker partners or joint venturers or to afford any rights to any third party other than as expressly provided herein.

18.    **Severability.**  Subject to the provisions hereof, in the event any provision contained in this Agreement is held to be invalid, illegal or unenforceable, such holding shall not affect any other provision hereof and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

19.    **[Reserved]**

20.    **Governing Law.**  The parties agree that this Agreement and the transactions herein contemplated shall be interpreted, construed and enforced under and according to the laws of the State of New York without regard to its conflicts of law principles.  All claims, demands, proceedings, litigation or other actions arising hereunder shall be commenced in the United States District Court for the Southern District of New York.

**{Signature Page to Follow}**

12705845

**IN WITNESS WHEREOF,** the parties have executed this Agreement to be effective as of the date first above written.

TAMA BROADCASTING, INC.

By:  
Name:  
Title:

TAMPA BROADCASTING, LTD.

By:  
Name:  
Title:

TAMA GROUP, L.C.

By:  
Name:  
Title:

TAMA BROADCASTING GROUP OF FLORIDA, L.C.

By:  
Name:  
Title:

TAMA RADIO LICENSES OF SAVANNAH, GEORGIA, INC.

By:  
Name:  
Title:

TAMA RADIO LICENSES OF TAMPA, FLORIDA, INC.

By:  
Name:  
Title:

LOCAL MARKETING AGREEMENT                                    Page 10 of 11

BE GREENWICH STREET    Fax:212-796-8785        Sep  7 2007  18:18    P.03
SEP-06-2007(THU) 13:52    WTMP AM & FM                (FAX)813 628 0713            P. 002

TAMA RADIO LICENSES OF
JACKSONVILLE, FLORIDA, INC.

By:        _____
Name:    Glenn Williams
Title:     President/CEO

BERNARD RADIO LLC

By:        _____
Name:    Lawrence Cutler
Title:     Director

ATTACHMENT I

Compensation and Reimbursement Schedule

Beginning on the Commencement Date and on the first business day of each month thereafter during the Term of the Agreement, Broker shall pay Licensees, without setoff, a monthly fee of $32,000 (the "Monthly Fee") for certain expenses incurred by Licensees in connection with the operation of the Stations as set forth below:

Costs and expenses associated with Licensee's employees at the Stations:  $20,000/month
Music license fees to ASCAP, BMI and SESAC                                $10,000/month
Unanticipated costs and expenses                                          $2,000/month

Simultaneously with its second payment of the Monthly Fee, Broker shall make a one-time payment to Licensees in the amount of $35,000.

Additionally, Broker shall pay Licensees, upon written invoice, an amount equal to (but in no event exceeding $16,000) Licensees' FCC regulatory fees due and owing for FY 2007.

Unless Licensees are required by order or informal request of the FCC to pay other operating expenses of the Stations, no other fees, costs, or expenses shall be payable by Broker to Licensees on account of the operation of the Stations in accordance with the terms of the Agreement or otherwise. Payments of all amounts due hereunder for any partial month shall be prorated on a daily basis. The Monthly Fee shall be subject to adjustment as mutually agreed by Broker and Licensees.

**ATTACHMENT II**

**Form of Payola Affidavit**

City of _____        )
                                 )
County of _____        )        SS:
                                 )
State of _____        )

**ANTI-PAYOLA/PLUGOLA AFFIDAVIT**

_____, being first duly sworn, depose and say as follows:

I am _____ for [_____], [city, state].
          Position

1.    I have acted in the above capacity since _____.

2.    No matter has been broadcast by station (the "Station") for which service, money or other valuable consideration has been directly or indirectly paid, or promised to, or charged, or accepted, by me from any person, which matter at the time so broadcast has not been announced or otherwise indicated as paid for or furnished by such person.

3.    So far as I am aware, no matter has been broadcast by the Station for which service, money, or other valuable consideration has been directly or indirectly paid, or promised to, or charged, or accepted by the Station or by any independent contractor engaged by the Station in furnishing programs, from any person, which matter at the time so broadcast has not been announced or otherwise indicated as paid for or furnished by such person.

4.    In the future, I will not pay, promise to pay, request, or receive any service, money, or any other valuable consideration, direct or indirect, from a third party, in exchange for the influencing of, or the attempt to influence, the preparation of presentation of broadcast matter on the Station.

5.    Nothing contained herein is intended to, or shall prohibit receipt or acceptance of anything with the expressed knowledge and approval of my employer, but henceforth any such approval must be given in writing by someone expressly authorized to give such approval.

6.    I, my spouse and my immediate family do__ do not__ have any present direct or indirect ownership interest in (other than an investment in a corporation whose stock is

1

publicly held), serve as an officer or director of, whether with or without compensation, or serve as an employee of, any person, firm or corporation engaged in:

   a.  The publishing of music;

   b.  The production, distribution (including wholesale and retail sales outlets), manufacture or exploitation of music, films, tapes, recordings or electrical transcriptions of any program material intended for radio broadcast use;

   c.  The exploitation, promotion, or management or persons rendering artistic, production and/or other services in the entertainment field;

   d.  The ownership or operation of one or more radio or television station;

   e.  The wholesale or retail sale of records intended for public purchase;

   f.  Advertising on the Station, or any other Station owned by its Licensees (excluding nominal stock holdings in publicly owned companies).

  7.  The facts and circumstances relating to such interest are none____ as follows____:

_____

_____

_____

                           Affiant

Subscribed and sworn to before me this
_____ day of _____, 20_____.

_____
Notary Public

My Commission expires: _____.

2

## ATTACHMENT III

### Pre-Existing Programming, Trade and Barter