**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------- X

D.B. ZWIRN SPECIAL                    :
OPPORTUNITIES FUND, L.P.,              :
                                      :
                    Plaintiff,        :
                                      :        **OPINION AND ORDER**
                                      :
          - against -                 :        **08 Civ. 3125 (SAS)**
                                      :
TAMA BROADCASTING, INC.,              :
TAMA RADIO LICENSES OF                :
SAVANNAH, GEORGIA, INC., TAMA         :
RADIO LICENSES OF TAMPA,              :
FLORIDA, INC., and TAMA RADIO         :
LICENSES OF JACKSONVILLE,             :
FLORIDA, INC.,                        :
                                      :
                    Defendants.       :
-------------------------------------------------- X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

D.B. Zwirn Special Opportunities Fund, L.P. ("D.B. Zwirn") brings

this action against Tama Broadcasting, Inc. ("Tama") and certain of its

subsidiaries for breach of contract stemming from Tama's failure to fulfill its

payment obligations under financing agreements entered into with plaintiff.

Presently pending before the Court is plaintiff's motion by order to show cause for

the appointment of a temporary receiver to protect defendants' assets, which serve

as collateral to those agreements. For the reasons that follow, the case is

remanded to state court *sua sponte* for lack of subject matter jurisdiction.

## II.    BACKGROUND

### A.    Facts[1]

D.B. Zwirn is a Delaware limited partnership with its principal place

of business in New York.[2]  Some of the partners comprising the partnership are

Delaware corporations.[3]  Tama, a Delaware corporation with its principal place of

business in Florida, owns several radio stations in Georgia and Florida.[4]  Tama

Radio Licenses of Savannah, Georgia, Inc., Tama Radio Licenses of Tampa,

Florida, Inc., and Tama Radio Licenses of Jacksonville, Florida, Inc. (collectively,

the "Tama Subsidiaries") are Florida corporations principally conducting business

---

[1]    The following facts are taken from the Amended Complaint ("Compl."), and the parties' submissions in support of and in opposition to the pending motion.  Plaintiff amended its complaint on April 23, 2008 to name additional defendants.  These defendants have not yet had the opportunity to answer the complaint.  Because the Court and the parties have an interest in proceeding efficiently and because defendants' answer would not change the outcome, I issue this Opinion and Order without further delay.

[2]    *See* Compl. ¶ 2.

[3]    *See* 4/21/08 Letter from Steven Paradise, plaintiff's counsel, to the Court at 1.  *See also* Defendant Tama's Notice of Removal ¶¶ 12-14 (stating that plaintiff is a limited partnership, and that plaintiff's "general partner is D.B. Zwirn Partners LLC is a Delaware limited liability company with its principal place of business in New York, New York").

[4]    *See* Compl. ¶ 3.

in that state.[5]  They are subsidiaries of Tama and they own certain broadcasting

licenses issued by the Federal Communications Commission (the "FCC") that

Tama uses to transmit radio programming on its radio stations.[6]

        D.B. Zwirn, as sole lender, and Tama, as sole borrower, executed a

financing agreement dated March 17, 2004, pursuant to which D.B. Zwirn made a

term loan in the aggregate principal amount of $21 million so that Tama could

fund certain acquisitions and refinance existing debt (the "Financing

Agreement").[7]  Simultaneous to the execution of the Financing Agreement, D.B.

Zwirn and Tama executed a security agreement, providing that an event of default,

as defined in the agreement, would give plaintiff the right to foreclose on those

assets that Tama had pledged as collateral for the loan (the "Security

Agreement").[8]  The Tama Subsidiaries are signatories to the Security Agreement.

Under the terms of that agreement, the collateral includes all of defendants'

accounts, inventory, investment property, intellectual property, fixtures, all

---

[5]     *See id.* ¶¶ 4-6.

[6]     *See id.*

[7]     *See* Plaintiff's Memorandum of Law in Support of its Request for an Order to Show Cause for the Appointment of a Temporary Receiver ("Pl. Mem.") at 3.  *See also* Compl. ¶ 8.

[8]     *See* Compl. ¶¶ 12-15.

proceeds from the sale of such collateral, and the "FCC licenses only to the extent such assignment or pledge [] would not cause a breach or default under such FCC license or violate any [f]ederal or state law."[9]

On June 30, 2005, the parties executed an amended agreement under which D.B Zwirn made an additional term loan in the principal amount of $1.5 million (the "Amended Financing Agreement").[10]  Under the Amended Financing Agreement, both of plaintiff's loans to Tama were to mature on June 30, 2006.[11]

Tama failed to fulfill its payment obligations under the Financing Agreement and the Amended Financing Agreement.[12]  Pursuant to section 2.03(a) of those agreements, Tama became responsible for the entire balance of the unpaid principal and accrued but unpaid interest on June 30, 2006.[13]  Despite Tama's failure to make any payments or to fulfill certain of its other obligations, D.B.

---

[9]     3/17/04 Security Agreement, Ex. B to Affidavit of Peter Leibman Vice President of DBZ Global Advisors LLC, affiliate of plaintiff ("Leibman Aff.") § 2.

[10]     *See* Compl. ¶ 9.

[11]     *See id.* ¶ 10.

[12]     *See id.* ¶ 18.

[13]     *See* 6/30/05 Amended and Restated Financing Agreement ("Amended Financing Agreement"), Ex. A to Compl., § 2.03(a) ("The outstanding principal of the Term Loans shall be repaid in full on the Final Maturity Date.").

Zwirn entered into a forbearance agreement with Tana dated January 23, 2007 (the

"Forbearance Agreement"). D.B. Zwirn deferred pursuit of its remedies until

February 15, 2007, and Tama acknowledged several "events of default" under the

Amended Financing Agreement.[14]

Following the termination of the Forbearance Agreement, Tama still

had not made any payments or cured any of its "events of default."[15] Instead of

pursuing remedies at that time, plaintiff entered into discussions with Tama to

restructure the underlying financial agreements. In connection with the potential

restructuring, Bernard Radio LLC, plaintiff's affiliate, entered into a Local

Marketing Agreement (the "LMA"), dated September 10, 2007, with Tama.[16]

Bernard Radio LLC's subsequently assigned its interest in the LMA to Straight

Way Radio LLC ("Straight Way"), another of plaintiff's affiliates.[17] Under the

terms of the LMA, which currently remains in effect, Straight Way agreed to

purchase broadcasting time on Tama's radio stations for a period of five years.[18]

---

[14]    *See* Compl. ¶¶ 19-20. *See also* 1/23/07 Forbearance Agreement, Ex. C to Leibman Aff.

[15]    *See* Compl. ¶ 20.

[16]    *See* Pl. Mem. at 6-7.

[17]    *See id.* at 7.

[18]    *See id.*

## B.    Contractual Provision on Appointment of Temporary Receiver

Both the Financing Agreement and the Amended Financing

Agreement contain language regarding the appointment of a temporary receiver.

The pertinent language provides:

> [T]he Agent may, and shall at the request of the Required
> Lenders, by notice to the Administrative Borrower . . . (iv) seek
> the appointment of a receiver or keeper to take possession of all
> or any portion of the Collateral or to operate same and, to the
> maximum extent permitted by law, may seek the appointment of
> such a receiver without the requirement of prior notice or a
> hearing, subject to 9.02 . . . the Transaction Parties further agree
> to consent to the appointment of a receiver (selected by the Agent
> and approved by the Required Lenders) by any court of
> competent jurisdiction. Such receiver may be instructed to seek
> from the FCC consent to an involuntary assignment or transfer of
> control of the Broadcast Licenses issued to any Transaction Party
> by the FCC with respect to any Station [] for the purposes of
> seeking a bona fide purchaser or purchasers or any such
> Transaction Party's right, title and interest in and to such Station
> . . . The receiver shall have the power subject to Section 9.02, to
> dispose of any or all of the Transaction Parties' right, title and
> interest in and to any Station . . . including the power to conduct
> a public or private sale . . . provided, however, that the successful
> bidder . . . shall not acquire the FCC License with respect to such
> Station unless and until the FCC shall first have granted its
> consent to such acquisition.[19]

---

[19]    Amended Financing Agreement § 9.01(x)(iv). Section 9.02 governs
"FCC matters" and states, inter alia, that "The Agent's rights hereunder (and the
rights of any receiver appointed by reason of the exercise of remedies hereunder)
with respect to the Stations and the FCC Licenses are expressly subject to the
Communications Laws." *Id.* § 9.02.

## C.    Procedural History

D.B. Zwirn originally brought suit against Tama in New York

Supreme Court for breach of contract pursuant to a "consent to jurisdiction"

provision in the Amended Financing Agreement.[20]  Plaintiff claims that, as of

February 29, 2008, Tama owes approximately $40.1 million dollars plus interest

that continues to accrue at an increased post-default rate, as set by the agreement.[21]

Plaintiff seeks judgment in the approximate amount $40.1 million plus interest, as

well as judicial foreclosure on all of defendants' assets that were pledged as

collateral to the loans under the Security Agreement.  According to plaintiff, this

requested foreclosure includes, "subject to any FCC appropriate approval,

foreclosure and transfer of the collateral that constitutes stock of Tama [] or its

subsidiaries that represents control of licenses issued by the FCC . . . ."[22]

Simultaneous to the filing of the suit, plaintiff filed an Order to Show

Cause as to why a temporary receiver should not be appointed.  Tama removed the

action to federal court on March 27, 2008, prior to the scheduled hearing in state

court on the Order to Show Cause, on the grounds that the suit seeks relief under

---

[20]    *Id.* § 12.10.

[21]    *See* Compl. ¶ 22.

[22]    *Id.* ¶ 23.

7

the Communications Act of 1934, a federal statute, and there may be diversity

jurisdiction.  By letter dated April 3, 2008, plaintiff's counsel requested that this

Court conduct an expedited hearing on the Order to Show Cause and the

underlying motion to appoint a temporary receiver.  The Court held conferences

on April 9 and 14, 2008, at which time the parties argued the instant motion.  On

April 23, 2008, plaintiff amended its complaint to add the Tama Subsidiaries as

defendants on the ground that those subsidiaries actually own the FCC licenses

pledged as collateral to the loans.

## III.  APPLICABLE LAW

### A.  Federal Subject Matter Jurisdiction

A federal court may exercise jurisdiction only if Congress has passed

a statute granting it such jurisdiction.[23]  Under 28 U.S.C. § 1331, district courts

have original jurisdiction over "all civil actions arising under the Constitution,

laws, or treaties of the United States"[24] so that plaintiffs might have a federal

---

[23]    *See* U.S. Const. art. III, § 2.  *See also Exxon Mobil Corp. v. Allapattah Servs., Inc.* 545 U.S. 546, 552 (2005) ("The district courts of the United States, as we have said many times, are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute." (citation and quotation marks omitted)).

[24]    28 U.S.C. § 1331.

8

forum when they seek to vindicate a federal right.[25]  "'A case arises under federal

law within the meaning of [section] 1331 . . . if a well-pleaded complaint

establishes either that federal law creates the cause of action or that the plaintiff's

right to relief necessarily depends on resolution of a substantial question of federal

law.'"[26]

### B.    Remand

When a plaintiff files a complaint in state court that could have been

filed originally in federal court, Congress allows the defendant or defendants to

remove the action from state to federal court under 28 U.S.C. § 1441 ("section

1441") and 28 U.S.C. § 1446 ("section 1446").  Section 1441 sets forth the

jurisdictional basis for removal, while section 1446 establishes the procedural

requirements for removing the action to federal court.

The requirements for considering a motion to remand to state court

are set forth in 28 U.S.C. § 1447 ("section 1447").  "A motion to remand the case

on the basis of any defect other than lack of subject matter jurisdiction must be

made within 30 days after the filing of the notice of removal under section

---

[25]     *See Allapattah*, 545 U.S. at 552.

[26]     *Bay Shore Union Free School Dist. v. Kain*, 485 F.3d 730, 734 (2d
Cir. 2007) (quoting *Empire Healthchoice Assurance, Inc v. McVeigh*, 547 U.S.
677, 689-90 (2006)).

1446(a)."[27]  However, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.  An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."[28]

The reason for section 1447(c)'s short and strict deadline is obvious: the court and parties have a substantial interest in resolving which court will decide the action before any court or the parties devote resources to the case, or the court resolves particular issues.  As Congress explained in passing the statute, "'[s]o long as the defect in removal procedure does not involve a lack of federal subject matter jurisdiction, there is no reason why either State or Federal courts, or the parties, should be subject to the burdens of shuffling a case between two courts that each have subject matter jurisdiction.'"[29]

Because jurisdiction goes to the issue of the court's power, a motion to remand based on lack of subject matter jurisdiction may be made at any time.  Either a court has the power to adjudicate a case or it does not.  Indeed, a federal

---

[27]    28 U.S.C. § 1447(c).

[28]    *Id.*

[29]    *In re Allstate Ins. Co.*, 8 F.3d at 223 (quoting H.R. Rep. No. 889, 100th Cong., 2d Sess. 72 (1988)).

court has an independent duty to determine that it has subject matter jurisdiction and may raise the issue *sua sponte*.[30]

## IV.  DISCUSSION

### A.    Federal Subject Matter Jurisdiction

Prior to the scheduled hearing on plaintiff's motion for appointment of a temporary receiver, Tama removed this action from state court on two grounds: *first*, and primarily, that there is federal subject matter jurisdiction because the "relief [plaintiff] seeks (appointment of a receiver and, ultimately, the sale of Tama's licenses) will result in the transfer, disposition, or transfer of control of the corporation[s] holding Tama's broadcast licenses;"[31] and *second*, that there may be diversity of citizenship among the parties and the amount in controversy exceeds $75,000.[32]

Tama now concedes that the Court has no diversity jurisdiction over this action, and that concession is supported by the Court's own review of the

---

[30]    *See* Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). *Accord Kontrick v. Ryan*, 540 U.S. 443, 455 (2004).

[31]    Defendant Tama's Notice of Removal ¶ 9.

[32]    *See id.* ¶¶ 12-21.

facts.[33]  Therefore, as Tama implicitly recognized when removing the action from

state court, the only possibly valid ground for removal is federal question

jurisdiction.

　　　　　While not one of first impression, the jurisdictional issue presented by

this case presents a close call.[34]  The parties agree that federal question jurisdiction

exists here.  Indeed, Tama removed the action from state court on that ground and

plaintiff states in its amended complaint that "jurisdiction [] is proper because [it]

seeks relief pursuant to a federal statute, *i.e.*, the Communications Act of 1934."[35]

Notwithstanding the parties' agreement, I hold that there is no federal question

jurisdiction over this action because plaintiff's well-pleaded complaint does not

---

[33]　　Plaintiff is a Delaware limited partnership comprised of at least one
general partner that is a Delaware corporation.  Tama is also a Delaware
corporation.  *See id.* ¶¶ 12-14.  *See also* Compl. ¶¶ 2-3.  In the absence of complete
diversity among the parties, diversity jurisdiction cannot be the ground upon
which the Court exercises jurisdiction over this action.  *See St. Paul Fire and
Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80-81 (2d Cir. 2005).

[34]　　*See, e.g., Citicasters Co. v. Stop-26 Riverbend, Inc.*, 107 F. Supp. 2d
871, 874-76 (N.D. Ohio 2000) (remanding action brought by provider of radio
programming against station operator for breach of agreement governing
broadcast programming but noting that the jurisdictional issue "troubled" the court
since removal and presented a close call).

[35]　　*See* Compl. ¶ 7.

assert a federal claim.[36] The parties are correct that plaintiff seeks relief in the

form of temporary receivership over and judicial foreclosure of defendants' assets

that were pledged as collateral pursuant to the Security Agreement, including the

FCC licenses held by the Tama Subsidiaries.[37] The Supreme Court has made

clear, however, that the mere invocation of a "federal issue" cannot serve as a

"password opening federal courts to any state action embracing a point of federal

law."[38] Rather, the "question is, does a state law claim necessarily raise a federal

issue, actually disputed and substantial, which a federal forum may entertain

without disturbing any congressionally approved balance of federal and state

judicial responsibilities."[39]

At its core, this is a state law breach of contract action. Plaintiff has

brought suit for the breach of the financing agreements under which it loaned

Tama a large amount of money. Plaintiff now seeks to recover as much of that

---

[36]    *See, e.g.*, *Verizon New York Inc. v. Choice One Commc'ns of New York, Inc.*, 499 F. Supp. 2d 326, 336 (S.D.N.Y. 2007) (remanding action to state court notwithstanding the parties' agreement that plaintiff's claim arose under the Telecommunications Act where the contractual provision at issue was privately negotiated and was not derived from federal law).

[37]    *See* Compl. ¶ 23.

[38]    *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).

[39]    *Id.*

13

money as it can by filing a breach of contract action, and by moving for the

appointment of a temporary receiver to preserve the value of its collateral.  Among

its requested relief, plaintiff seeks "foreclosure and transfer of the collateral that

constitutes stock of Tama or its subsidiaries that represents control of licenses

issued by the FCC . . . [and] a receiver to hold (subject to FCC approval) such

licenses pending their sale . . . ."[40]  Federal law – the Communications Act – is

implicitly invoked because the collateral at issue includes FCC licenses, and the

Communications Act governs the transfer of those licenses.

Resolving plaintiff's claim and determining the relief to which it is

entitled will likely require some interpretation and application of the

Communications Act.  However, these issues are ancillary to the core of plaintiff's

cause of action.  Indeed, plaintiff's request for the appointment of a temporary

receiver implicitly invokes the Communications Act only to the extent that

plaintiff notes that the receiver's ability to hold the FCC licenses pending their

sale is "subject to FCC approval."[41]

---

[40]     Compl. ¶ 23.

[41]     *Id. See McFaddin Express, Inc. v. Adley Corp.*, 346 F.2d 424, 427
(2d Cir. 1965) ("That the contracts [at issue] could not be lawfully carried out save
with [Interstate Commerce Commission] approval does not, without more,
demonstrate that Congress meant all aspects of their performance or non-
performance to be governed by [federal] law [] rather than by state law applicable

14

The fact that the FCC would have to approve the transfer of licenses from the licensees to a receiver, should one be appointed, is not really disputed by the parties. Based on the conferences held before the Court, the parties do not and cannot dispute that the mere appointment of a temporary receiver would not per se violate the Communications Act if, as an initial matter, the receiver seeks FCC approval of the transfer of the licenses from the licensees to itself. Moreover, the issue does not – or at least, no longer – presents "a substantial question of federal law."[42] A number of courts have appointed receivers over assets that include FCC licenses where radio station owners have defaulted on loan obligations, without running afoul of the Communications Act.[43] In fact, plaintiff itself notes that the New York State Supreme Court appointed a receiver in a similar case it brought against a different defendant-owner of radio stations, and based on a substantively

---

to similar contracts relating to business not under federal regulation.").

[42]    *Bay Shore Union Free School Dist.*, 485 F.3d at 734.

[43]    *See, e.g.*, *MLQ Investors, L.P. v. Pacific Quadcasting, Inc.*, 146 F.3d 746 (9th Cir. 1998) (district court appointed receiver shortly after plaintiff filed suit, authorized receiver to perform his duties, and subsequently entered orders authorizing receiver to sell defendant's assets at private sale, "after securing FCC approval for transfer of the broadcast licenses"); *State Street Bank v. Arrow Commc'ns, Inc.*, 833 F. Supp. 41 (D. Mass. 1993) (district court appointed receiver and authorized her to sell defendant's radio station, and the FCC approved each change in broadcast licensee for the station, including the temporary acquisition of the broadcast license by the receiver).

identical contractual provision to the one found in the financing agreements at issue here.[44]

Plaintiff's invocation of the requirement of FCC approval does not, standing alone, convert its breach of contract claim into one that "arises under" the Communications Act.[45] Although determining the appropriate relief to which plaintiff is entitled – should plaintiff succeed in its action – may require some interpretation of the Communications Act and will involve seeking the approval of the FCC, "it is still the contracts, and not federal law, that the plaintiff[] seeks to have enforced."[46]

---

[44]    *See* Pl. Mem. at 10-11 (citing *D. B. Zwirn Special Opportunities Fund, L.P. v. Associated Radio*, No. 603275 (N.Y. Sup. Ct. Jan. 9, 2006)).

[45]    28 U.S.C. § 1331. *See MFS Telecom, Inc. v. Intrepid Commc'ns Solutions, Inc.*, 39 F. Supp. 2d 478, 479 (D.N.J. 1999) (dismissing action brought by telecommunications service provider against customer for lack of subject matter jurisdiction, where, "although the rates in the contract [at issue] may have been controlled by tariffs filed with the FCC, "the crux of the [] disagreement – the obligation of the defendant to pay – arises out of the agreement itself . . . and is not created by the Communications Act").

[46]    *Dickinson v. Cosmos Broad. Co., Inc.*, No. 91-T-071-N, 1991 WL 715723, at *6 (M.D. Ala. Apr. 1, 1991) (remanding class-action suit for breach of contract and breach of legal duty against broadcasting stations for alleged overcharging for the broadcast of political advertisements on the ground that no federal question jurisdiction exists where the Communications Act provides no federal private action, no serious challenge to federal law was presented, and plaintiffs essentially sought enforcement of certain contracts). *See id.* ("[A]lthough the source of, and force behind the contracts between the plaintiffs

I remand this action back to state court, but note that Tama's conduct has been deeply troubling. For the brief period during which I have presided over this case, Tama has engaged in numerous tactics that appear motivated by a desire to delay the resolution of plaintiff's breach of contract claim for as long as possible. Plaintiff brought suit in state court and the parties fully briefed plaintiff's motion for appointment of a temporary receiver. Just prior to the state court's scheduled hearing on that motion, Tama removed the case to federal court, prompting plaintiff to request that the Court conduct an expedited hearing on its pending motion.[47] Rather than joining in that request, Tama asked that, instead, the Court stay any decision on the motion for appointment pending a decision on its anticipated motion to transfer the action to be consolidated with an action in the Middle District of Florida.[48]

In an effort to become familiar with the issues raised in this action, I convened two expedited conferences with the parties. Once it became clear that the jurisdictional grounds for removal, particularly diversity jurisdiction, were

---

and the broadcasters may be federal, it is still the contracts, and not federal law, that the plaintiffs seek to have enforced.").

[47]    *See* 4/3/08 Letter from Steven Paradise to the Court ("Paradise Letter") at 1-3.

[48]    *See* 4/4/08 Letter from David Wawro, defendants' counsel, to the Court at 1-2.

weak, Tama then conceded that removal may have been improvident and
requested that the case be remanded back to state court. At each stage, the Court
has been struck by Tama's attempts to delay the efforts made first by the state
court and now by this Court to reach the merits of this case.[49] I remand this case
*sua sponte* because it was improvidently removed to federal court, but I
sympathize with plaintiff's frustrated desire to have this case promptly proceed to
the merits. For that reason, I include below this Court's anticipated decision on
plaintiff's motion for appointment of a temporary receiver should the state court
choose to regard it as guidance, however limited, on that still-pending motion.

---

[49]     Additionally, at a conference held on April 14, 2008, Tama made yet
another attempt to delay by insisting that the motion for appointment of a
temporary receiver could not be decided without an evidentiary hearing. *See, e.g.*,
Transcript of Court Conference ("4/14/08 Tr.") at 23:7-7-8 (Defendants' counsel:
"We strongly believe that before a decision like this is made, an evidentiary
hearing is appropriate . . . ."). This assertion was made despite both parties'
repeated representations to the Court only days before that no evidentiary hearing
was desired or needed. Indeed, I noted on the record that the parties could have
conducted an evidentiary hearing rather than oral argument at that same
conference, but had declined to do so. *See id.* at 40:25-41:2 (The Court: "I asked
the parties [if an evidentiary hearing was needed]. No, and Mr. Wawro said no
too." Plaintiff's counsel: "We both said no, that's correct."). Tama's belated
insistence that the motion could not be resolved without an evidentiary hearing
was therefore contrary to its own previous assertions.

**B.    Motion to Appoint Temporary Receiver**[50]

Plaintiff sets forth two grounds in support of its motion for appointment of a temporary receiver: *first*, that Tama expressly agreed to the appointment pursuant to the terms of the Financing Agreement and the Amended Financing Agreement, which govern the loans at issue; and *second*, apart from the contractual provision, plaintiff's collateral for the loans is in "imminent danger of being lost, materially injured or diminished in value because of [Tama's] insolvency and gross mismanagement."[51]

---

[50]    This section applies federal common law to the question of whether to appoint a temporary receiver. The vast majority of relevant cases are those that have been properly removed to or filed in federal court based on diversity jurisdiction, and the decision to appoint a receiver in a diversity action is governed by federal common law. *See Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000). Because federal common law and New York law have substantively similar standards on whether to grant this motion, as plaintiff concedes, and because I find that the outcome would be the same irrespective of the standard applied, I leave intact the following discussion. *See Ryan Beck & Co., Inc. v. Daly Holdings, Inc.*, No. 06 Civ. 5349, 2006 WL 3775964, at *2 (S.D.N.Y. Dec. 19, 2006) ("The Court need not determine whether state or federal law applies because in practice the [federal and state] standards for appointment are likely to be essentially the same.") (alteration in original) (citation omitted). *Accord* 4/9/08 Transcript of Court Conference ("4/9/08 Tr.") at 19:10-12 (Plaintiff's counsel: "New York law and federal law on this [motion to appoint a temporary receiver] are quite similar. If anything, federal law may be a bit more expansive."). *See also* N.Y. C.P.L.R. 6401 (2007) ("[A] temporary receiver may be appointed . . . where there is danger that the property will be removed from the state, or lost, materially injured or destroyed.").

[51]    Paradise Letter at 1-2.

Plaintiff notes that both the Financing Agreement and the Amended Financing Agreement contain language making clear that Tama "agrees to consent to the appointment of a receiver . . . by any court of competent jurisdiction" upon the occurrence of any event of default.[52]  Because Tama previously admitted in the Forbearance Agreement that several events of default have already occurred, plaintiff asks that the Court appoint a temporary receiver pursuant to the agreed-upon contractual provision.  In support of its motion, plaintiff notes that in previous litigation, the New York State Supreme Court relied on a substantively identical provision in a similar financing agreement between plaintiff and another borrower to appoint a receiver.[53]

Alternatively, even if the Court does not enforce the contractual provision, plaintiff argues for the appointment on the ground that Tama is insolvent and in imminent danger of being forced to shut down its radio stations.[54]  As a result, "all of [defendants'] radio equipment, accounts receivable, revenues and value of the broadcasting licenses" granted by the FCC, which plaintiff secured as collateral pursuant to the Security Agreement, are in danger of being

---

[52]     Amended Financing Agreement § 9.01(x)(iv).

[53]     *See* Pl. Mem. at 10-11.

[54]     *See id.* at 12-16.

lost or devalued.  Because the value of plaintiff's collateral depends on Tama's ability to broadcast, and because Tama has conceded that its ability to do so is in jeopardy, plaintiff contends that a receiver must be appointed.[55]

Tama does not dispute that the financing agreements allow for the appointment of a receiver.  Rather, Tama premises its opposition primarily on the ground that equitable rather than contractual principles should govern, and plaintiff's own unclean hands should equitably estop it from seeking appointment of a receiver.[56]  Specifically, Tama contends that plaintiff grossly mismanaged its operations following plaintiff's take-over of "complete control" of Tama's radio stations pursuant to the LMA.  Chris McMurray, Straight Way's consultant, allegedly mismanaged Tama's properties by, inter alia, unilaterally cancelling programming at its radio stations in violation of certain agreements, diverting payments from Tama's customers to plaintiff's accounts, and refusing to reimburse Tama for operating expenses in violation of the LMA.[57]

As an initial matter, the contractual provision in the financing

---

[55]    *See id.*

[56]    *See* Defendant Tama's Memorandum of Law in Opposition to Plaintiff's Motion, by Order to Show Cause, for Appointment of a Temporary Receiver ("Def. Opp.") at 2-5.

[57]    *Id.*

21

agreements is a factor that the Court considers in deciding whether appointment is warranted. In the context of mortgage agreements, the Second Circuit Court of Appeals has affirmed the appointment of a receiver where the agreement provided that plaintiff may apply for such appointment upon the occurrence of any event of default, as defined therein.[58] Where it was undisputed that several events of default had occurred, the court found the provision "strongly support[ed] the appointment of a receiver."[59]

The mere existence of such contractual provision does not, however, dispose of the Court's inquiry in plaintiff's favor. Indeed, courts retain the "discretion to deny appointment of a receiver under appropriate circumstances even though the mortgage provides the mortgagee a specific right to an appointment."[60] However, the existence of such language, presumably negotiated between the parties, is a factor militating in plaintiff's favor[61] and the party

---

[58]    *See, e.g., Citibank*, 839 F.2d at 97 ("It is entirely appropriate for a mortgage holder to seek the appointment of a receiver where the mortgage authorizes such appointment, and the mortgagee has repeatedly defaulted on conditions of the mortgage which constitute one or more events of default.").

[59]    *Id.*

[60]    *Ariani v. Concourse Tenants Corp.*, No. 93 Civ. 0377, 1999 WL 637238, at *2 (S.D.N.Y. Aug. 20, 1999) (citations omitted).

[61]    *Cf. Melnick*, 2007 WL 2769490, at *2 (denying plaintiff's motion to appoint a temporary receiver where, inter alia, "[p]laintiffs have failed to point to

opposing the appointment bears the burden of demonstrating why a receiver should not be appointed.[62]

Considering all of the factors relevant to the inquiry, including the existence of the contractual provision, I grant plaintiff's motion to appoint a temporary receiver. Although plaintiff does not allege that Tama has engaged in any fraudulent conduct,[63] this Court has appointed receivers even where there was no evidence of fraud.[64]

It is undisputed that Tama has defaulted on its loan obligations under the financing agreements, although the exact amount that remains outstanding may be in dispute.[65] Tama contends that plaintiff, specifically, Straight Way, is responsible for gross management following the execution of the LMA, thereby

---

any contractual provision that contemplates the appointment of a receiver with regard to these [] properties . . . .").

[62]    *See id.* at *2-3.

[63]    *See* Def. Opp. at 6.

[64]    *See, e.g.*, *United States v. Trusty Capital, Inc.*, No. 06 Civ. 8170, 2007 WL 44015, at *8 (S.D.N.Y. Jan. 5, 2007) (granting plaintiff's motion for appointment of receiver even in the absence of evidence of fraud where defendant defaulted on its payments to plaintiff).

[65]    *See* Affidavit of Dr. Glenn W. Cherry, president and chief executive officers of Tama, in Opposition to Plaintiff's Motion for Appointment of a Temporary Receiver ("Cherry Aff."), attached to Def. Opp., ¶ 3. *Accord* 4/9/08 Tr. at 14:13-25 (Defendants' counsel: "There is a payment default, yes.").

jeopardizing its operations. Tama, however, cannot contest that its payment obligations under the financing agreements were due and unmet prior to the LMA, and its failure to make those payments cannot be attributed to the actions of plaintiff or Straight Way.

According to plaintiff, Tama's current outstanding debt includes rent for several of its radio stations, property taxes, six thousand dollars per month pursuant to a settlement agreement in a different case, and payments to an industry research company.[66] As a result of these debts, as well as the amount due to plaintiff, Tama is insolvent and "will soon lose all of its assets and [plaintiff] in turn, will lose all of its security, and any chance to recover on its loans."[67] Additionally, plaintiff's collateral is in further danger due to Tama's alleged failure, inter alia, to maintain the lighting for certain of its broadcast towers in violation of the FCC and the Federal Aviation Administration's regulations, to employ at least two employees at each of its five main stations in violation of FCC regulations, and to properly maintain its radio equipment.[68]

---

[66]    *See* Affidavit of Chris McMurray ("McMurray Aff."), consultant to Straight Way, attached to Plaintiff's Order to Show Cause for an Appointment of Temporary Receiver, ¶ 7.

[67]    Pl. Mem. at 14.

[68]    *See id.* at 14-16. *Accord* McMurray Aff. ¶ 9.

While Tama contests some of these points and asserts that it has actually improved many aspects of its operations,[69] regardless of who is at fault, Tama concedes that "its ability to continue to broadcast [is] at risk."[70] Irrespective of which party bears the bulk of the blame for placing the operations at risk, the fact remains that there is an imminent danger of the property being diminished in value and possibly lost. Tama's claim that a temporary receiver should not be appointed because of plaintiff's alleged "unclean hands" is not convincing. The temporary receiver – an officer of the court tasked with the "duty to preserve and protect the property pending the outcome of the litigation"[71] – will work to discharge that duty without deference to either party and with preservation of the property as its sole objective. Should plaintiff indeed be the party responsible for mismanagement, then the temporary receiver would equally protect the assets against plaintiff as it would against defendants. The temporary receiver's sole loyalty and responsibility lies with the Court and the assets, rather than with any of

---

[69]    *See, e.g.*, Cherry Aff. ¶¶ 20-21. For example, defendant asserts that it has maintained the operations for all of its transmitting facilities, purchased new transmitters, scheduled the painting of certain towers, and is in the process of assessing whether to use the FCC construction permits it contends have not expired. *See id.*

[70]    *Id.* ¶ 10.

[71]    *Citibank, N.A.*, 839 F.2d at 98.

the parties.

Tama's mounting obligations, in addition to the money owed to plaintiff, and its failure to "demonstrate any concrete plan for recovering its debts"[72] strongly militates in favor of appointment.  Notwithstanding the assertion made by Tama's affiant that the Court should require the parties "to develop a plan to market the properties for a deliberate arms-length sale" rather than appoint a receiver, that level of cooperation and communication between the parties appears highly unlikely at this time.[73]

I briefly turn to the remaining factors relevant to the appointment inquiry.  In light of the amount of plaintiff's loans, Tama's concession that numerous events of default under the financing agreements have occurred, and the

---

[72]    *Trusty Capital*, 2007 WL 44015, at *8 (stating that defendant's failure to demonstrate a concrete recovery plan other than borrowing additional funds is an "insufficient guarantee, and would leave [plaintiff] with insufficient means to recover what it is owed").

[73]    Indeed, the only purported proposal for the purchase of defendants' assets was preliminarily rejected by plaintiff's counsel as undervalued and generally unacceptable. *See* 4/4/08 Letter from Dario Echeverry Campos, Chairman of HLE Consulting, Inc., to Glenn W. Cherry, president of Tama, Ex. 3 to Defendant Tama Broadcasting's Supplemental Memorandum in Opposition to Appointment of a Temporary Receiver. *See also* 4/14/08 Tr. at 20:19-23 (Plaintiff's counsel: "[The offer is] for $11 million.  Number three, it's free and clear of all liens.  So I think there are several problems just off the surface.  Our appraisers had indicated, as I mentioned in court last week, that the value's closer to $20, 25 million.").

current state of Tama's operations, I find that denying plaintiff's motion would

harm plaintiff more than the appointment would injure defendants.  In fact, Tama

has failed to demonstrate how such appointment would injure it, other than

displacing some of its own authority.  Additionally, there is a strong probability

that plaintiff will succeed in its underlying action, which is premised on Tama's

admitted breach of the financing agreements by failing to fulfill its payment

obligations.

There may be alternative legal remedies that would protect the

property at issue here.  Tama concedes that while plaintiff "may be entitled to

recover on its rightful investment,"[74] it should "exercise it[s] rights as a secured

party with respect to the [c]ollateral by seeking damages and judgment at trial."[75]

However, considering all of the relevant factors including the contractual language

agreed to between the parties regarding receivership and the imminent danger of

Tama's property continuing to diminish in value, this factor is not dispositive.

Finally, I briefly turn to Tama's argument that the appointment of a

temporary receiver would violate the Communications Act.  Section 310(d) of the

Communications Act prohibits the transfer of a FCC license without the

---

[74]    Def. Opp. at 8.

[75]    *Id*. at 7.

application to and approval of the transfer by the FCC.[76]  Tama contends that because plaintiff "does not even allege that it has made such an application to the FCC – much less obtained the required approvals . . . Tama is required by law to maintain control of its licenses."[77]

Though not binding, the authority on this issue weighs in favor of finding that appointment of a temporary receiver would not run afoul of the Communications Act.  Plaintiff primarily relies upon the Ninth Circuit's decision in *Phoenix Leasing Inc. v. Sure Broadcasting, Inc.* ("*Phoenix Leasing*") to dispute Tama's argument.[78]  At the outset, I note that *Phoenix Leasing* was not published as an opinion by the Ninth Circuit.  However, on at least one occasion, this Court has relied on an unreported Ninth Circuit case "involving strikingly similar facts" that was "directly on point."[79]  The facts of *Phoenix Leasing* are strikingly similar

---

[76]    *See* 47 U.S.C. § 310(d) ("No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby.").

[77]    Def. Opp. at 9.

[78]    Nos. 94-15594, 95-16204, 1996 WL 219608 (9th Cir. May 1, 1996).

[79]    *Conopco, Inc. v. Roll Int'l Corp.*, 75 F. Supp. 2d 196, 200-01 (S.D.N.Y. 1999), *aff'd*, 231 F.3d 82 (2d Cir. 2000) ("The fact that the Ninth Circuit chose not to publish [its opinion] leaves this Court in a quandary.  The

28

to the ones at issue here, and I find the opinion persuasive notwithstanding the Ninth Circuit's decision not to publish it.

In *Phoenix Leasing*, the Ninth Circuit affirmed the district court's appointment of a receiver where the parties had entered into a loan agreement providing for the plaintiff to petition for a court-appointed receiver should any event of default occur, defendant defaulted, and plaintiff brought suit. "The [district] court appointed a receiver over all of [defendant's] assets and directed the receiver to apply to the FCC for assignment of the licenses."[80]  Thereafter, the "FCC approved the transfer of the licenses *to the receiver*."[81]

The Ninth Circuit rejected the defendant's argument that the district court's appointment of a receiver violated FCC policy, and in doing so, made several observations. *First*, although it is clear that "creditors cannot foreclose on an FCC license," "they may have an interest in the proceeds from the sale of the

---

Ninth Circuit rule governing citation of unpublished opinion states that an unpublished case 'may not be cited to or by' the courts of the Ninth Circuit. The rule is silent as to citation by courts outside the circuit. In these circumstances, I assume [the Ninth Circuit opinion] is not binding precedent. It is, however, directly on point and persuasive; accordingly, I adopt the reasoning set forth therein.").

[80]    *Phoenix Leasing*, 1996 WL 219608, at *1.

[81]    *Id.* (emphasis added).

license."[82]  Therefore, plaintiff, as Tama's creditor, has a legitimate interest in the

value of the FCC licenses held by Tama's subsidiaries.

      *Second*, "the FCC has routinely approved involuntary assignments of

licenses in cases where licensees have filed for bankruptcy or where courts have

appointed receivers."[83]  Under *Phoenix Leasing*, it is the responsibility of the

receiver to comply with section 310(d) of the Communications Act and to seek the

FCC's approval of the involuntary transfer of the licenses from the licensees to

itself.  The FCC may exercise its discretion to deny approval at that time.

Based on the persuasive authority of other courts that have addressed this precise

issue, the fact that receivers have been appointed over assets including FCC

licenses on numerous occasions, and Tama's failure to cite to any case holding

otherwise, the mere appointment of a receiver does not per se violate the

Communications Act.[84]

---

[82]    *Id.* (citation omitted).

[83]    *Id.* (quotation marks omitted).

[84]    Defendants' reliance on *Kid Commc'ns v. Federal Commc'n Comm'n* is misplaced.  There, the D.C. Circuit held that the FCC had provided inadequate explanation for its decision to approve the application to transfer defendant's radio station license back to the original seller.  *See* 427 F.3d 1 (D.C. Cir. 2005).  The court held that the FCC's decision was in conflict with its own regulation prohibiting a seller from retaining a reversionary interest in a station license, as well as the policy prohibiting a license holder from granting a security interest in a broadcast license.  This case is distinguishable as there is no dispute regarding the

## IV.    CONCLUSION

For the reasons set forth above, this action is remanded to state court for lack of subject matter jurisdiction.  The Clerk of the Court is directed to close all pending motions and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
April 28, 2008

_____

appointment of a receiver.  Furthermore, here, plaintiff seeks only to preserve the value of the broadcast licenses through the appointment of a receiver rather than take any direct action with respect to those licenses.

31

## - Appearances -

**For Plaintiff:**

Steven Robert Paradise, Esq.
Michael S. Davi, Esq.
Michael V. Rella, Esq.
Vinson & Elkins LLP
666 Fifth Avenue, 26th Floor
New York 10103
(917) 206-8000

**For Defendants:**

David W.R. Wawro, Esq.
Ian Michael Goldrich, Esq.
Torys LLP
237 Park Avenue
New York, NY 10017
(212) 880-6000

Percy Squire, Esq.
Squire & Pierre-Louis LLC
65 East State Street, Ste. 200
Columbus, OH 43215
(614)224-6525